UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
YESSIMKHAN YELESHEV,

                        Petitioner,

               v.

ANTHONY J. LAROCCO, et al.,

                        Respondents.

------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
26-CV-2294-SJB

**BULSARA, United States District Judge:**

Petitioner Yessimkhan Yeleshev, a citizen of Kazakhstan, entered the United

States lawfully on October 6, 2025 on a B-2 visitor's visa.  (Pet. for Writ of Habeas

Corpus filed May 6, 2026 ("Pet."), Dkt. No. 1 ¶¶ 16–17; Resp'ts' Letter filed May 7, 2026

("Resp'ts' Letter"), Dkt. No. 8 at 1).  On January 5, 2026, 89 days before his B-2 visa

expired, Yeleshev filed an application for asylum with USCIS.  (Pet. ¶ 19).  His visa then

expired on April 4, 2026.  (*Id.* ¶ 17)

Yeleshev was arrested by U.S. Immigration and Customs Enforcement ("ICE")

officers on May 4, 2026 at his asylum interview in Bethpage, New York.  (*Id.* ¶¶ 26–28).

ICE used an arrest warrant that it issued before it placed Yeleshev in removal

proceedings.  The arrest warrant itself contained a false statement and was in part, if not

large part, issued based on authority that ICE does not have.  Because his arrest was

illegal, Respondents are directed to release Yeleshev.[1]

Yeleshev was arrested and detained pursuant to 8 U.S.C. § 1226(a), (Resp'ts'

Letter at 2), which provides: "an alien may be arrested and detained pending a decision

on whether the alien is to be removed from the United States," 8 U.S.C. § 1226(a).  But

such an arrest can only be based "[o]n a warrant issued by the Attorney General."  *Id.*

8 C.F.R. § 1236.1 limits the time in which such a warrant may be executed: "*[a]t the time*

---

[1] Respondents appear to have the better of the argument that the statutory tolling provision contained in 8 U.S.C. § 1182(a)(9)(B)(iii)(II), which provides that an individual is not unlawfully present during the pendency of an asylum application, does not also confer legal status.  As a result, it appears that Yeleshev's filing of an asylum application did not extend his legal status.  But Respondents (not their counsel) are engaging in a form of simultaneous deception: the USCIS website unequivocally states that an individual with a pending asylum application is *not subject to removal*, and states that referral for removal proceedings may occur only after an interview.  USCIS, Obtaining Asylum in the United States (Oct. 17, 2025), https://perma.cc/T6V2-YBEB ("You may live in the United States while your Form I-589 is pending before USCIS."); *id.* ("If your case is not approved and you do not have a legal immigration status, we will issue a Form I-862, Notice to Appear (NTA), and refer your case to an immigration judge with the Department of Justice's Executive Office for Immigration Review (EOIR)."); USCIS, Instructions for Application for Asylum and Withholding of Removal, 11 (Jan. 20, 2025), https://perma.cc/ZZG8-UNG8 ("While your case is pending, you will be permitted to remain in the United States.  After your asylum interview, if you have not been granted asylum and appear to be removable under section 237 of the INA, 8 U.S.C. 1227, or inadmissible under section 212 of the INA, 8 U.S.C. 1182, the asylum office will refer your application, together with the appropriate charging document, to the Immigration Court for adjudication in removal proceedings.").  Here, Yeleshev was put in removal proceedings before his asylum interview was completed.  Respondents affirmatively represent to individuals that when they file for asylum they need not fear removal during the pendency of their asylum proceedings.  For ICE to orchestrate the arrest of an individual after USCIS has advised that individual he may remain in the country is the height of bureaucratic duplicity and malfeasance.  The Court does not reach the question of whether this scheme—which induces individuals to file for asylum on the promise that removal proceedings will not begin for some period of time—is another reason to grant the writ.

*of the issuance of the notice to appear [NTA], or at any time thereafter* and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest." 8 C.F.R. § 1236.1(b) (emphasis added). "The NTA begins the removal process, and at that time or after its issuance, the Government can then effectuate [an] arrest, and, if necessary, detention, until removal proceedings are completed." *Gopie v. Lyons*, No. 25-CV-5229, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025) (citing *Niz Chavez v. Garland*, 593 U.S. 155, 157–58 (2021)). The NTA is the immigration version of a "charging instrument," and the I-200 is the warrant that follows.

In other words, an I-200 cannot be used to effectuate an arrest *before* an NTA has been issued. *See Parada Cruz v. Mullin*, No. 26-CV-1110, 2026 WL 1027441, at *2 (E.D.N.Y. Apr. 16, 2026) ("If ICE is going to use an arrest warrant, then there must be removal proceedings initiated before or at the time of the arrest. Such proceedings are begun through the issuance of a Notice to Appear ('NTA'). There is no 'leeway.' If ICE wants to use a warrant, it must have a valid NTA in place."); *Aparicio v. Genalo*, No. 26-CV-1411, 2026 WL 698872, at *5 (E.D.N.Y. Mar. 12, 2026) ("[T]he regulations require that removal proceedings are pending or at least that a Notice to Appear was served at the time of arrest."); *cf. Saqr v. Holder*, 580 F.3d 414, 422 (6th Cir. 2009) ("The cancellation of a notice to appear also cancels any outstanding warrants issued by the Attorney General for the alien's arrest." (citing 8 C.F.R. § 239.2(e))).

Here, the ICE officer who arrested Yeleshev testified that the exact opposite took place. The I-200 warrant for Yeleshev's arrest was filled out by a supervisor before

3

"[the officer] left the Nassau County intake" to effectuate Yeleshev's arrest. (Tr. dated May 11, 2026 ("May 11 Tr.") at 9:19-25). ICE officers then went to an asylum office in Bethpage, where Yeleshev was being interviewed, "explained to [Yeleshev] that . . . [they] h[ad] a warrant for [his] arrest," and "showed . . . everybody in the room the [I-]200." (*Id.* at 9:7-13). ICE then arrested Yeleshev, and transported him to a Nassau County intake trailer in a different location. (*See id.* at 9:15-17, 10:16-17). Once there, another ICE officer signed the bottom of the warrant, certifying that the warrant was served on Yeleshev. (*Id.* at 10:5-17). Respondents were unable to provide the exact time the NTA was issued, but concede that it was not until at least half an hour to an hour and a half *after* Yeleshev was arrested. (Resp'ts' Letter filed May 11, 2026, Dkt. No. 13 at 1; May 11 Tr. at 14:1-10). As a result, the NTA was not served on Yeleshev during or before his arrest at the asylum office in Bethpage—ICE officers did not have the NTA with them when they arrested Yeleshev, (May 11 Tr. at 13:12-14), and instead "read [the NTA] to [Yeleshev] on or about . . . an hour after [they] had gotten back to the Nassau County intake from the asylum office," (*id.* at 13:15-19).

Although the time frame between the issuance of the arrest warrant and the issuance of the NTA here was relatively short, the law nonetheless does not permit what occurred. "ICE does not have free-ranging ability to arrest and detain people, and figure out the reasons later[.]" *Gopie,* 2025 WL 3167130, at *3; *Parada Cruz,* 2026 WL 1027441, at *5 ("Police and law enforcement cannot operate as roving bands, detaining individuals, figuring out the reasons later, and papering over their failures afterwards.").

4

ICE's failure to issue an NTA before arresting Yeleshev is unjustified. The ICE officer testified that the NTA was not issued until after Yeleshev's arrest because of a "time constraint." (May 11 Tr. at 25:6-10). But he stated that it only takes 15 to 20 minutes to complete an NTA. (*Id.* at 28:4-7). And Yeleshev received an A-Number at his fingerprinting appointment on January 27, 2026, (*id.* at 64:21–65:1; Pet. ¶ 22); his B-2 visa expired on April 4, 2026, (Pet. ¶ 17); and his asylum interview was scheduled in January, (*id.* ¶ 23). Respondents thus had all the relevant information about Yeleshev well in advance of his arrest. Respondents provide no justification as to why they could not have placed Yeleshev into removal proceedings in the monthlong period preceding his arrest.[2]

ICE has limited authority to conduct warrantless arrests. *See* 8 U.S.C. § 1357(a)(2) (limiting authority to conduct a warrantless arrest to situations where an ICE officer "has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest"); 8 C.F.R. § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."). Cognizant of these limitations, ICE officers instead proceed to draw up warrants on their way to detain individuals, or after they encounter

---

[2] The arresting ICE officer made reference to a "scratch NTA," which the Court takes to mean a draft NTA that had been in process prior to arrest. (*See* May 11 Tr. at 13:8-11). But the statute and regulation give no weight to draft documents.

them.[3]  But they miss the predicate step—ICE has no free ranging arrest warrant authority, but only the ability to use warrants once it has begun removal proceedings. In *Parada Cruz*, this Court listed 30 cases where ICE had quite obviously disregarded this process required by statute and its own regulations.  2026 WL 1027441, at *10–*12. Except in the limited circumstances permitting warrantless arrests (which often all turn on the existence of exigent circumstances), due process does not tolerate arrest first and charge later schemes, regardless of how "technical" the failures may seem.  *Cf. Giordenello v. United States*, 357 U.S. 480, 485–86 (1958).  Indeed, placing someone in removal proceedings is no mere administrative paperwork matter—it requires a full examination of a person's immigration record to verify that there is in fact a basis for removal.  *See* 8 U.S.C. § 1229(a) (listing information required in an NTA).  And only certain individuals—a group different than those who may affect arrests, namely supervisors—can place individuals into removal proceedings.  *Compare* 8 C.F.R. § 239.1(a) (listing personnel authorized to issue NTAs), *with* 8 C.F.R. § 287.5(c) (listing personnel with arrest authority).  Arresting someone first, and then placing them in removal proceedings upends these procedural safeguards; when someone is arrested first, and the reasons located later, there is an inevitable pressure to "justify" or find some legal basis for removal proceedings, which heightens the risk of error and in other

---

[3] ICE specifically trains officers to "carry a blank form I-200 for [arrests] *so that an individual flight risk analysis is not needed.*"  *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 848 (N.D. Ill. 2025) (quoting a slide from an ICE Academy training presentation) (emphasis added), *aff'd in part*, No. 25-3050, -- F.4th --, 2026 WL 1223250 (7th Cir. May 5, 2026).  That of course violates the statute and the implementing regulations.

cases, something far worse.  And mistaken, illegal, or pretextual arrests lead to people spending time in detention when perhaps they should not.

In *Gopie*, this Court stated that "at that time or after" the issuance of an NTA, "the Government can then effectuate [an] arrest, and, if necessary, detention, until removal proceedings are completed."  2025 WL 3167130, at *1.  That language derives from 8 C.F.R. § 1236.1 ("At the time of the issuance of the notice to appear[.]").  Whatever the full contours of "at that time of," the phrase does not encompass issuing an NTA after the Petitioner has already been arrested and transported to a detention facility.  The warrant's *execution* cannot precede the NTA—that is, ICE cannot arrest the individual pursuant to an I-200 before an NTA has issued.  But here, the arrest was effectuated before the NTA was created.  That flaw renders the warrant and the arrest invalid.  *Cf. Bogomazov v. U.S. Dep't of Homeland Sec.*, No. 20-CV-24482, 2022 WL 769801, at *9 (S.D. Fla. Feb. 27, 2022) ("[T]he allegations . . . do not support the conclusion that the first arrest was part of the commencement or adjudication of removal proceedings.  Indeed, the allegations clearly state that the Notice to Appear was served after the arrest when Defendant was already detained at the Krome Detention Center[.]"), *report and recommendation adopted,* 2022 WL 767104 (Mar. 14, 2022); *Gonzales v. FedEx Ground Package Sys., Inc,* No. 12-CV-80125, 2013 WL 12080223, at *9 (S.D. Fla. Aug. 1, 2013) ("[A] removal proceeding is initiated by the service of a notice to appear upon an alien. . . . ICE's alleged misconduct occurred *before* Plaintiffs were arrested and *before* Gonzales signed an order of removal or Plaintiff Vasquez was scheduled for a future immigration hearing.").

There are also flaws fatal in the warrant itself that require granting the writ. Two boxes are checked on Yeleshev's I-200, attesting that ICE believed there was probable cause to arrest him based on: (1) "the execution of a charging document to initiate removal proceedings against the subject," and (2) "biometric confirmation of the subject's identity and a records check of federal databases . . . that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law." (I-200, attached to Resp'ts' Letter as Ex. B, Dkt. No. 8-3). The first statement was false and there are substantial doubts as to the validity of ICE's basis for checking the second box.[4]

*First*, the I-200's statement that ICE had probable cause to arrest Yeleshev because of "the execution of a charging document to initiate removal proceedings against [him]," (*id.*), is false:

> THE COURT: You will see that there are two X boxes that are checked [on the I-200]. The first one is the execution of a charging document to initiate removal proceedings against the subject. What does that refer to?
> THE WITNESS: That's referring to the NTA, Your Honor.
> THE COURT: At the time this was filled out, was there an NTA for this individual?
> THE WITNESS: Not at the time of arrest, Your Honor.
>
> *          *          *
>
> THE COURT: When was the NTA actually initiated?
> THE WITNESS: I don't know the actual time, Your Honor.
> THE COURT: Before or after the arrest warrant?

---

[4] To the extent this second box purports to confer arrest warrant authority in the absence of an NTA, that is, to permit the arrest of someone in the United States illegally pursuant to an I-200 where there is no NTA, it cannot do so. Such authority would be inconsistent with the regulations—which expressly tie ICE's authority to arrest pursuant to an I-200 to an NTA. *See* 8 C.F.R. § 1236.1(b). "[A]n agency cannot expand the scope of its statutory and regulatory authority through the expedient of creating a form that purports to do so." *Castañon Nava*, 806 F. Supp. 3d at 853.

THE WITNESS: After the arrest warrant, Your Honor.

(May 11 Tr. at 12:14-24, 13:23–14:3). Thus, at the time the arrest warrant was issued and signed by an ICE officer, no removal proceedings had been initiated. This purported basis for probable cause to arrest therefore rests on a false statement, and could not provide authority to arrest Yeleshev.

*Second,* the second alleged basis — that Yeleshev "lacks immigration status or notwithstanding such status is removable under U.S. immigration law" — appears to have been, at least in significant part, based upon a complete legal misapprehension. The arresting ICE officer said he was "notified by [his] supervisor that there was an individual at the asylum office in Bethpage that [he] needed to go apprehend because of an INTERPOL red notice." (May 11 Tr. at 4:11-14).[5] The officer believed ICE had the authority to detain individuals based upon an Interpol Red Notice, yet he could not identify any law or statute authorizing such a practice:

> THE COURT: I'm trying to understand what's your understanding of ICE's authority to arrest someone who has a red notice?
> THE WITNESS: I don't know, Your Honor.
> THE COURT: Okay. Have you ever arrested anyone with a red notice before?
> THE WITNESS: No, Your Honor.

(*Id.* at 6:16-23).

---

[5] The Red Notice contains vague allegations of dental pension fraud, that Yeleshev ████████████████████████████████████████ ███████████████████████████████████████████████████ Yeleshev alleges these prosecutions are politically motivated, and that he disclosed his involvement in advocating for pensioners' rights to access their funds free from government restrictions in his asylum application. (Pet'r's Suppl. Letter filed May 10, 2026 ("Pet'r's Suppl. Letter"), Dkt. No. 12 at 2–5).

THE COURT: I want to understand what is your understanding of someone's legal ability to be in the United States if they are the subject of a red notice? I'm trying to figure this out so that I can understand what law or regulation to look at. . . . What's your understanding about a red notice and the ability and how that affects someone's legal status in the United States?

THE WITNESS: We have the authority to do that, Your Honor.

THE COURT: Under what law or statute?

THE WITNESS: I'm not sure at this time, Your Honor.

THE COURT: Does that matter whether or not the red notice is with a country that has an extradition treaty or not?

THE WITNESS: No, Your Honor.

THE COURT: Have you ever consulted with the Department of Justice about your authority to detain people or extradite them under red notices?

THE WITNESS: No, your Honor.

(*Id.* at 20:13–21:12). At a minimum, this ICE officer believes that irrespective of legal status, ICE has the authority to detain someone based on a Red Notice. When the Court questioned ICE's authority to arrest an individual based on a Red Notice in response to the officer's first statement that he was directed to apprehend Yeleshev "because of an INTERPOL red notice," (*id.* at 4:13-14), he offered a different basis for the arrest, stating that "the individual had overstayed his visa," (*id.* at 5:22-24).

A Red Notice confers no detention authority, and no provision of the Immigration and Nationality Act ("INA") permits detention of an individual based solely upon a Red Notice. "Congress has not seen fit to prescribe that an Interpol Red Notice alone is an independent basis for removal." *Radiowala v. Att'y Gen. United States*, 930 F.3d 577, 580 n.1 (3d Cir. 2019).[6] Even the Justice Department does not rely on a Red

---

[6] It may be that a Red Notice can serve as a fact in a risk of flight analysis, *e.g.*, *Kharis v. Sessions*, No. 18-CV-4800, 2018 WL 5809432, at *8 (N.D. Cal. Nov. 6, 2018), or as evidence to deny asylum, *see Tatintsyan v. Barr*, 799 F. App'x 965, 967 (9th Cir. 2020). But that is a far cry from using it as a basis to arrest and detain, which is the situation here.

Notice alone to arrest. *Id.* ("[T]he Department of Justice's view is that, by itself, a Red Notice is not a sufficient basis for arresting someone, for its issuance often falls short of what the Fourth Amendment requires."); *see Hernandez Lara v. Barr*, 962 F.3d 45, 48 n.3 (1st Cir. 2020). And for good reason — "a Red Notice is not independently vetted for factual and legal justification, its reliability corresponds with that of the foreign nation's arrest warrant." *Gonzalez-Castillo v. Garland*, 47 F.4th 971, 978 (9th Cir. 2022) (quotation omitted); *see also G.R.R. v. Hermosillo*, No. 26-CV-0097, 2026 WL 395268, at *4 (W.D. Wash. Feb. 12, 2026) ("[U]nsubstantiated INTERPOL Red Notices raise questions of reliability that require additional consideration.") (collecting cases).[7]

The supervisor and arresting officer's conduct — using the Red Notice to arrest Yeleshev — violates ICE's own policies and contradicts what ICE itself says about such documents: "A Red Notice or Wanted Person Diffusion is not an international arrest warrant and conveys no legal authority to arrest, detain, or remove a person. Therefore, ICE personnel will not rely exclusively on Red Notices or Wanted Person Diffusions to

---

[7] It is well-established that certain countries abuse Red Notices to target political opponents, activists, and other critics. *See* Tara Degn & Kaori Kenmotsu, *Transnational Repression (TNR): A Game of Whack-a-Mole*, 16 Creighton Int'l & Comp. L.J. 132, 144 (2025) ("[A]uthoritarian regimes have weaponized Red Notices by sending out false notices against dissidents by claiming they are wanted criminals or terrorists. In essence, authoritarian regimes use the Red Notice system to target and harass dissidents abroad. There has been an explosive growth in alerts, increasing from 3,126 in 2008 to 12,260 in 2023."); Sam Meacham, *Weaponizing the Police: Interpol as a Tool of Authoritarianism*, Harv. Int'l Rev. (Apr. 11, 2022), https://perma.cc/CP6B-XDMG; Cate Brown, Max Hudson, & Julia Luft, *Russia Using Interpol's Wanted List to Target Critics Abroad, Leak Reveals,* BBC (Jan. 25, 2026), https://perma.cc/5ADV-EL7A. Here, Petitioner alleges that the Red Notice was sought as retaliation for his political activities, and that is the basis for his pending asylum application. (Pet'r's Suppl. Letter at 2–5).

justify enforcement actions or during immigration proceedings." ICE Directive 15006.1 (Aug. 15, 2023), https://perma.cc/N2CG-BX2A. And this ICE Policy contains a bevy of requirements and steps that must be followed before relying on a Red Notice, including training and due diligence on the notice to test its legitimacy. *See id.* There is no evidence these procedures were followed in this case or the arresting officer received any of the required training.

Moreover, ICE lacks the power to extradite someone for criminal prosecution— again something that this ICE officer seemed to misapprehend, believing that it was important to detain someone because a foreign country had initiated a criminal case:

> THE COURT: But how does a red notice affect their legal status? For instance, imagine there is someone with a tourist visa like this individual, what does the red notice have to do with their ability to stay in the United States or not?
> THE WITNESS: Your Honor, with all due respect, if the roles were reversed and there was an individual that was wanted by the United States and he was in another country, the United States would do everything in their power to get that individual back to the United States for prosecution.

(May 11 Tr. at 19:19–20:5). That power to arrest and extradite lies with the Justice Department, which has to present an application to a federal judge to obtain a warrant to arrest for the purposes of extradition. *Noeller v. Wojdylo*, 922 F.3d 797, 802 (7th Cir. 2019) ("After the United States government receives a formal extradition request through diplomatic channels, the request will be forwarded to a U.S. Attorney's Office, which will typically file a formal complaint and seek an arrest warrant from a judge."); *see also* 18 U.S.C. § 3184. No evidence of any pre- or post-arrest coordination with the Justice Department was presented to the Court. Such coordination is likely to have been useless: the Red Notice was issued by Kazakhstan, a country with whom the

United States has no extradition treaty.  *See* 8 U.S.C. § 3181, https://perma.cc/ZKD9-BHWX (listing countries with which the United States has extradition agreements).

The ICE officer's testimony in this case reflects a gross misconception about what a Red Notice is, and about ICE's detention authority.  This complete lack of understanding from an ICE officer exercising arrest and detention authority is deeply concerning.  He appears to have received little relevant training or understanding about the scope of and limits on what he could use as the basis to detain and arrest someone, and what he could not.  And because he said he was acting at the direction of his supervisor, who suggested that the Red Notice was a basis for arrest, the same is true for the supervisor.  This is all sadly consistent with the testimony of other ICE officers in this District who had a similar lack of appreciation of the limits to ICE's detention authority.  *See, e.g.*, *Alfaro v. Mullin*, No. 26-0766, 2026 WL 734348, at *3 (E.D.N.Y. Mar. 16, 2026) (noting ICE officer's flawed understanding of law: "[An ICE officer] with nearly 20 years' experience as an immigration officer—testified that individuals with [Special Immigrant Juvenile Status] and deferred action were 'all amenable to removal proceedings . . . they can be taken into ICE custody and placed into removal proceedings'" and  "[t]he same was true, he testified, of cooperating crime victims possessing a U Visa.").

Returning to the I-200, the second box checked says that ICE determined Yeleshev was removable based on "biometric confirmation . . . that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."  It does not specify whether ICE checked this box because of the Red

Notice, the fact that Yeleshev overstayed his tourist visa, or both. If the box was checked based solely on the Red Notice, it is erroneous. A Red Notice has nothing to do with an individual's legal status or removability, and ICE has no authority to arrest individuals based on a Red Notice. Respondents' counsel conceded as much. (May 11 Tr. at 34:8-12 ("I'm not aware of an independent authority that the red notice provides to effectuate an arrest[.]")). If the box was checked based on Yeleshev's visa overstay, the arrest warrant could have been valid, had the NTA been issued prior to the execution of the arrest warrant, which it was not.[8] Notably, overstaying a visa is not a criminal offense. *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

There is little caselaw to evaluate the effect of a material misstatement in an I-200 administrative warrant. To be sure, in the criminal context, defective arrest warrants can be saved by any number of doctrines—good faith or a *Franks* analysis of the effect of a false statement, among others. *See United States v. Stephens*, 983 F.2d 232 (5th Cir. 1993) (per curiam) (applying good faith exception to arrest warrant); *Franks v. Delaware,* 438 U.S. 154, 171–72 (1978); *United States v. Howard,* No. 21-3006, 2023 WL 2980320, at *1–*2 (2d Cir. Apr. 18, 2023) (applying *Franks* to allegations that arrest warrant was unsupported by probable cause). And an arrest warrant's invalidity does not automatically invalidate an arrest if the officer had independent probable cause to

---

[8] While the ICE officer who testified claimed that the second box on the I-200 was checked based on both the visa overstay and the Interpol Red Notice, (May 11 Tr. at 14:19-24), he was not the officer who filled it out—his supervisor was, (*id.* at 9:24–10-4, 33:3-6). And he testified that his supervisor told him to go arrest Yeleshev "because of an INTERPOL red notice." (*Id.* at 4:11-14).

effectuate the arrest. *United States v. Broward*, 594 F.2d 345, 350 (2d Cir. 1979). To that end, where there is no independent probable cause, and the warrant is invalid, the arrest is also illegal. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568–69 (1971). Of course, these doctrines deal with judicial warrants—created after a neutral judicial officer or a grand jury determines probable cause to arrest—and no such doctrines have been developed for administrative warrants, where the agency itself both draws up the warrant and confirms probable cause exists.

The Court cannot conclude on this record that Yeleshev's arrest warrant was valid. It is plain that the Red Notice was the moving force behind the arrest and detention. After the Court questioned the authority to use a Red Notice to arrest someone, the ICE officer changed course—claiming that "[t]he individual ha[d] overstayed his visa" and the Red Notice was only "[o]ne of the reasons" for Yeleshev's arrest. (May 11 Tr. at 5:22-23, 6:13-15). It is hard to accord that credibility, given how the questioning proceeded. *Supra* pp. 9–12. Because the record reflects a substantial likelihood that Yeleshev's arrest warrant was issued solely based on the Red Notice, the Court has no choice but to conclude that Yeleshev's I-200 was invalid for that reason alone. *See, e.g.*, *Marleni S.B. v. Bondi*, No. 26-CV-1707, 2026 WL 710624, at *3 (D. Minn. Mar. 13, 2026) (finding I-200 invalid where the Court lacked sufficient evidence to assess "the basis for its issuance"); *Jouquin C.S. v. Bondi*, No. 26-CV-1438, 2026 WL 483256, at *3 (D. Minn. Feb. 20, 2026) ("Respondents did not provide any information about the officer that signed the warrant or when the warrant was signed. These

insufficiencies are critical and prevent the Court from determining that the warrant is valid.").

There is also the first problem of the false statement in the warrant itself. These defects separately render Yeleshev's arrest and detention unlawful. *See, e.g.*, *Hector J.A.S. v. Shea,* No. 26-CV-2242, 2026 WL 1243500, at *2 (D. Minn. May 6, 2026) ("Because the warrant is invalid, Petitioner's detention under 8 U.S.C. § 1226 is unlawful."); *Jefferson G.H.L. v. Blanche*, No. 26-CV-2344, 2026 WL 1229623, at *3 (D. Minn. May 5, 2026) ("Respondents represented to Petitioner in the Form I-200 administrative warrant that he was being arrested and detained under 8 U.S.C. § 1226, which requires a warrant. Because the warrant presented by Respondents is invalid, Petitioner cannot be legally detained under § 1226.").

Thus, there are two independent bases to grant the writ—the failure to initiate removal proceedings before or at the time of effectuating Yeleshev's arrest, and the use of an I-200 arrest warrant that was legally invalid. The writ is provisionally granted. Respondents are directed to effectuate Yeleshev's release by **May 15, 2026 at 5:00 P.M.** and file a letter on the docket confirming Yeleshev's release by that time. Respondents are enjoined from detaining Yeleshev absent further direction from this Court. Respondents may not use ICE ankle monitors or similar technology to monitor Yeleshev, because the Court has granted the writ.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: May 14, 2026
Central Islip, New York